Will the clerk please call the next case? 123-0984-WC, Kimberly Masters, appellant by Christopher Mose versus the Illinois Workers' Compensation Commission, Express Jet Airlines Incorporated, Appleby, by Kelsey Moore. Mr. Mose, you may proceed. Thank you, Your Honor. May it please the court? This case we have before us has a little bit of a unique presentation because it started as a case that was a question of whether the employer was justified in stopping the TTD payments, which were ongoing to the claimant. And then when it was tried, it became a case about whether the claimant had actually sustained an accident at all. The arbitrator, and also another unusual aspect, is that the arbitrator who issued the decision was not the arbitrator who tried the case. It was tried by Arbitrator Tiffany Kay, who was not continued in her position. So the case was then transferred to Arbitrator Wesley, who issued the decision. And I point this out because the commission, majority of the commission in its decision, observed that it was not going to defer to Arbitrator Wesley's credibility finding because she hadn't tried the case. Arbitrator Wesley had specifically said she found the petitioner's, I'm sorry, I keep saying petitioner, it's an old habit, Ms. Masters' testimony to be credible. And then the majority of the commission reversed this, although the dissenting commissioner stated that he did find her to be credible. So we have a situation where the decision was decided based upon the review of the record. One arbitrator and one commissioner found Ms. Masters to be credible, and the two commissioners found her not credible. Obviously, this court is reviewing the commission's decision in total, and it's under the manifest way to the evidence standard, since that is the standard for whether an accident occurred, which is a question of fact. But I bring this up because I just want to point out that the commission, I think it's ironic that the commission says it would give no deference to the arbitrator's finding that Ms. Masters was credible, because she didn't hear the witness testify, but the commission didn't either. So the commission really made its finding based upon the record, which is exactly what this court will be doing. And I would suggest that there's maybe less deference given to the commission's finding on credibility. There is, you know, this court is in absolutely as good of a position as the majority of the commission in assessing the record and determining whether the claimant was credible. The claimant, Ms. Masters, was the only witness who testified regarding her accident. The employer presented no evidence to address that issue. It presented some documentary evidence, which it relied upon. Chief among these was her employment schedule, which showed that she continued to work after her accident for that day and then the next two days. It also introduced a document regarding the reporting requirements for an injury. I'll address the significance of those a little bit, but I want to point out that the employer offered no evidence at all about whether the accident actually occurred. It didn't present any witnesses. It didn't present any witness statements. It didn't present any testimony from the individuals who worked with Ms. Masters after her alleged injury. And it didn't produce, excuse me, it didn't produce the accident report, which Ms. Masters said she completed with the chief pilot on January 5th. Now, the fact that the employer didn't present evidence creates an inference regarding evidence that's within its control that the evidence would be adverse to that party. ExpressJet argues that this evidence was equally available to Ms. Masters, but that's just not true. The accident report was completed by the chief pilot with the assistance of Ms. Masters, but she never had the accident report. She spoke with him on the phone and he presumably turned it into the company. The witnesses who saw the accident and who worked with her immediately after it are not available to Ms. Masters. She hasn't worked there in three, hadn't worked there in three years and had no way to contact people that were around. The employer presumably had the ability to contact its own employees and present any sort of evidence was available to it to rebut her claims of accident. I think this is the basis for an inference that there is no actual evidence to rebut her claims that she fell the way she said she did. Instead, the ExpressJet and the majority of the commission is relying upon the fact that Ms. Masters continued to work after her injury. She worked for the following two days. I don't think there's any evidence to suggest that she was not capable of working. She was later found to have a small non-displaced fracture of a patella, but there's no medical testimony that suggests she would not have been able to work, walk or even climb stairs. I think you need a medical conclusion to suggest that this would somehow preclude her of engaging in the conduct that she did after the accident. The ExpressJet also relies upon the fact that Ms. Masters didn't report her injury right away. This is a fairly common fact pattern we have in workers' compensation cases and it's not fatal. The law obviously gives an employee 45 days in which to report an injury, which is what Ms. Masters did. She reported it 19 days later to her chief pilot, so she's well within the legal time frame. I think the commission is relying on the fact that it thinks she should have reported it and stopped working immediately, and if she didn't, well, then she must not have had an injury. The dissent in the commission, I think... Let me ask you a question with regard to that. Did the company require that a report be done sooner than when she did? Well, according to the flight operations manual, it asked her to report it the same day. A lot was made by the majority in the commission that said she was supposed to report this to the National Transportation Safety Board and the FAA, and that, of course, is not true at all. If you look at the operations manual, when Ms. Masters was handed that at trial and asked, does this require you to report this to the government, she said yes. But if you look at it, that's clearly not the case. What it required, reporting requirements to the government are aircraft accident, aircraft overdue, believed to have been involved in an accident, flight control system or failure, malfunction or failure, aircraft collision, you know, genuine calamities. That's what the government wants to know about. It does indicate that a report should be filed if a crew member is unable to perform flight duties as a result of injury or illness. But that doesn't apply here because Ms. Masters obviously did perform her flight duties. She didn't say otherwise. So the commission's reliance on the fact that she was supposed to report this to the government is clearly wrong. And when she was handed the document again on redirect examination, she acknowledged that it doesn't say she's supposed to report this to the government. So that's a fiction that the commission is, the majority of the commission relied upon to say that, well, she's not credible. There's inconsistencies between her conduct and what this document required of her. And there's no inconsistency because she didn't have to report to the government. Now, obviously, we have lots of cases where claimants don't report their injury right away for whatever reason. They don't appreciate the extent of the injury. They think they'll get better. They don't want to pick a compensable in that sort of fact pattern. And I think it was incorrect for the commission to conclude that this somehow creates an inference that she was not credible because she didn't report it right away. The commission's decision largely relies on the majority, largely relies on speculation about what should have happened if there had been an accident. A prime example of this is that when asked why she didn't go to seek medical treatment immediately after the injury, Ms. Masters said, well, I knew the occupational clinic at O'Hare Airport wasn't open on Sundays. And the commission in its decision, the majority stated, well, we find that hard to believe that the clinic wouldn't be open on Sunday. There's no evidence. The commission has no idea, right? There's no evidence on the record about whether the clinic was open, closed, or anything. And for the commission to make up evidence is just totally improper. And it's not a basis to find that her testimony is incorrect in any way. The commission in this court is not required to believe the unrebutted testimony of a witness. We know that. But it's not allowed to reject the testimony of an unrebutted witness based upon surmise and conclusions. If there's actual evidence which rebutts it, that can be something the commission can rely on. Well, can I ask a question? Didn't the commission recite the evidence that it relied on? Yes. The commission recited the fact that she completed her job. And subsequent to that, and before reporting any injury to anyone, she flew, she performed pre-flight inspections, post-flight inspections, required a walking around. And then they made a very interesting observation. They said, if she fell on the ground into de-icing material, somebody there would have noticed it when she got back on the plane. I mean, and then they turned around and her testimony, the credibility of her testimony is undermined by the fact that, number one, she did not follow the FAA requirements and report the accident on the day it happened. She performed her duties. She didn't report anything for 19 days. And yet, she claimed to have a fracture and was in a lot of pain. She fell to her knees all over her arms and everywhere. And they turned around and said, under those circumstances, we don't believe it. And we don't think anything happened. And it's an uncorroborated statement of accident. They didn't believe it. But there's no basis for their lack of belief. The fact that she walked after sustaining this injury, which was later discovered to be a non-displaced fracture, doesn't mean that she couldn't have had the injury, right? You would need medical testimony that indicated that she could not have been walking or should not have been walking with this sort of injury. And there was none. ExpressJet introduced no evidence to rebut whether the accident happened. The fact that other people might have seen something is very interesting because those people could have been brought as witnesses. She testified that one of the ramp workers helped her up. And we know that she flew on a plane with other ExpressJet employees. But there should be some evidence to rebut her testimony before the commission can take away two years worth of TTD benefits and a surgery that ExpressJet paid for. The dissenting commissioner, I think, summed it up very well, that the commission is picking out minor inconsistencies and relying upon a belief that she shouldn't have been working with that injury when there's no medical basis for it. And as I've observed in my briefs, this court has rejected a similar decision from the commission when the medical records corroborated the petitioner's testimony, even though witnesses suggested that she did not have an injury. And I refer, of course, to Paris from 2021, where the claimants said she was working alone in a cooler and hurt her back while lifting boxes. And the respondent produced several witnesses who said, well, she had had problems before with her health due to high blood pressure, which she complained of and had been unable to work because of high blood pressure. And when we asked her about why she wasn't feeling well on the day she said she hurt herself, she merely mentioned high blood pressure and didn't mention hurting her back. And the witnesses had to be reminded that they didn't see her and an accident could have happened the way she suggested. So this court reversed the commission's corroborated that claimant's testimony, and there is no evidence to actually rebut her. Here, the only evidence is a conclusion that, well, gosh, I don't think it should have happened that way because, you know, why didn't she report it? Why did she keep working? Lots of people keep working and don't report it right away. I think it's a mistake to assume that if she had an injury, she would have done it the way the majority of the commission said she did. People do all sorts of things for all sorts of reasons. She's within the legal requirements reporting 19 days later. And all of the evidence suggests solid evidence, her testimony, medical records, and the lack of any evidence presented by the employer indicate that she fell the way she said she fell. And for that reason, I believe the majority decision is against the evidence. Questions from the bench? Further questions? No? Can't forget. Thank you, Mr. Mose. Thank you. Mrs. Moore, you may respond. Of course. Thank you. Good afternoon, justices, counsel. May it please the court? My name is Kelsey Moore, and I represent the Apelli Express Jet Incorporated. I'm here today to argue that the commission's decision regarding the issues of the accident and master's credibility is not against the manifest weight of the evidence and should be a form affirmed by this honorable court. Turning to the first point, the evidentiary record clearly demonstrates that petitioner failed to prove by the preponderance of the credible evidence that she sustained an accidental injury arising out of in the course of her employment with Apelli Express Jet Airlines on December 17, 2017. A claimant under the Workers' Compensation Act must prove by preponderance of the evidence that an accidental injury was sustained in the course of her employment. In other words, it is the claimant employee, in other words, Ms. Masters, and not the respondent employer or Express Jet that has the burden of proving by preponderance of the standard. Of course. She testified that an accident happened. Yes. The commission said she wasn't credible and gave reasons why she wasn't credible vis-a-vis the occurrence of an accident. Now tell us why the reasons given by the commission are sufficient to sustain its decision that she failed to prove accident? Of course, your honor. Yes. So the arbitrator, Arbitrator Kaye, of course, heard this claim and then she was unable to render the decision. It was Arbitrator Wesley who rendered a decision. She wrote merely five sentences indicating she found for accident. She did not indicate specific reasons why she believed petitioner was credible. We don't care what the arbitrator said. Of course. We want to know what the reasons were that the commission did. Yes. So the commission looked at the totality of the evidence. They looked at petitioner's testimony, both on direct cross-examination, rebuttal. They looked at the pairing statement, which was petitioner's schedule for the December 17th to December 20th of 2017. They correctly identified that petitioner was not credible. Petitioner initially testified that she sustained this injury. She identified- Oh, what's that schedule you just mentioned? Yes. So that is her pairing schedule. So that is the schedule of all of her flights. Pairing, P-A-I-R-I-N-G? P-A-R-I-N-G, yes. Pairing schedule. Yes. So it's basically a schedule of whether she was at work or not, right? Yes. Yes. And it showed that she completed 11 flights within the course of the three days. On the first day, she had four flights. But of course, one of those flights did not proceed as it just taxied out. And for whatever reason, it returned back to the hub. And petitioner then, you know, she had been on duty that day for 11 hours and one minute after this alleged injury. She then was on layover for 10 hours. The following day, she performed two flights. And then she had a layover of three hours. That same day, she then completed two more flights. What does that go to? What does that go to in regard to her credibility? The petitioner initially testified that she did not. She had one flight and then she was off work. She testified that she was required to perform the pre-flight and post-flight inspection. So that's, you know, you walk out onto the jet bridge. And right before you got into the plane, there's an exit and some big stairs that go down. The point is the pairing schedule is in contradiction to what she said she was required to schedule. Of course. But with regard to that, when did she testify in relation? How long after this accident did she testify about her schedule following the accident? It was two and a half years, Your Honor. So when she was reminded of some, in some way of the pairing schedule, did she correct herself? Uh, she, it was on, it was on cross-examination that we provided her with the pairing schedule and she looked at it and she did confirm that she had been provided with that prior to her flight, uh, prior to her presenting to work on December 17th, 2017. And she was aware that she did perform all those flights. So my point is after two and a half years, she testified initially to what she remembered her to be, was reminded of what her schedule actually was, and then corrected herself. And then, yes, she did admit that she performed the, the several flights and she worked for several more days. Yes. And I understand that the commission also concerned themselves about the, uh, the fact that she was able to complete her duties after this alleged fall. Um, but wasn't there testimony, wasn't her testimony that her crew members assisted her with up and down the ladder to pre-check and do some of those things and that her other flight duties basically only involved, uh, any physical, uh, activity in the case of an emergency, which there was none during those other flights? Yes. So she did testify that the captain assisted her with at least some of the 11, uh, 11 flights, uh, performing the pre-flight and post-flight inspections, whether that was, you know, all 22 flights that he assisted or sorry, inspections, or whether it was just a handful, we do not know, unfortunately. And it would have been speculation for the commission to assume that all of them, uh, either were with assistance or were without assistance. I believe the commission looked at the record and looked at the testimony and was able to make a decision based upon what petitioner testified to in the record. Who had the burden of establishing whether she was assisted on all of these flights by her captain or flight crew? So I would, that would be petitioner, as it is petitioner's burden to prove all of the elements of her claim. The commission found that in all of these flights that she took, that a pre-flight inspection and a post-flight inspection was required. And that in order to do that, you had to walk up two flights of stairs, walk up flight of stairs twice, and you had to walk around the airplane to check this stuff. Is there anything in the record that suggests that that's not true? No, there is not. No, there is not, Your Honor. And of course, too, with being a pilot, you not only have to just perform those, but you have to walk through an airport. You have to walk quite a significant amount. You have to walk all over an airport to get to your flight to find out where, you know, exactly where you're supposed to be. Petitioner was also, she also had some layovers at several different hotels. She was walking all around the airports, various different airports. There were a number of instances that she was performing her job duties. It's not just a desk job duty where she goes and fly the plane. There are quite a substantial amount of job duties that she has to perform. And the commission also noted that petitioner testified that the only reason why she did not report the alleged injury on December 17th was because she did not know whether her first officer was in the office. She also said that there was no medical providers were open on Sunday. But of course, all airports are federal buildings. And I would imagine that something as substantial as an airport would have. I think that the commission will take judicial notice of the fact that. That, according to your opponent, is pure speculation. And so, I mean, what is speculation is not. But the fact of the matter is, it may have been closed on Sunday, but she didn't seek medical attention for 19 days. It wasn't a situation where I think we can rule as a matter of fact that some medical facilities are open during that 19 day period, be it hospitals, doctors, et cetera, and so on. So, it may not have been available at O'Hare and the commission did rely in part on the fact that she sought absolutely no medical treatment for a fractured patella for 19 days after the alleged offense. Now, the reason why I'm asking this question is because it's the commission's job to determine the weight to be given to evidence. In this particular case, the commission didn't say it didn't happen. What the commission said was she didn't prove it happened by competent evidence. There's a difference between the two. So, based on what the commission found, is it your position that the commission had sufficient reasons to come to the conclusion that she failed to prove? Yes, of course, your honor. It is my belief that the commission relied on the totality of the evidence and had sufficient evidence and information to conclude that petitioner did not sustain a work-related injury on December 17, 2017. Okay. I would also point out that petitioner, following her work schedule from December 17 to December 19, she then went on an out-of-state vacation with her family. She did not just present to, it wasn't she figured, it was not that she finished out her schedule and then went to see medical attention. She just left her job and went on an out-of-state vacation with her family. She went, she drove to East Peoria with her family. She also went to Chicago with her family. There was a number of instances in which petitioner, as the commission indicated, did not act in accordance with somebody who sustained an accidental injury at work. Let me ask, was there any testimony with regard to her vacations with her family that indicated that she was perfectly capable of conducting herself or did she need assistance from her family or was there any testimony with regard to how she was on those vacations? Petitioner did not testify as to her, what she did on vacation or that she needed assistance or anything. Petitioner just stated that she went on a holiday vacation with her family to East Peoria and then also to Chicago. There was some surveillance that was also admitted into evidence which showed petitioner at a grocery store and then also at her son's hockey rink. With regards to that surveillance, petitioner initially testified she did not recall those days, that day in question. And then it was immediately thereafter when she was asked further questions by a respondent's counsel that petitioner then alleged she immediately recalled those days, that day in She immediately recalled that she was only that, and arbitrator Kay noted that petitioner did not pull out a calendar or anything. It was, the arbitrator was able to see that petitioner was, was not credible with her testimony following the accident. So there was a lot of testimony that petitioner provided not only with regards to the date of accident but also following the accident in regards to the surveillance wherein petitioner was, was not credible. Is it your position that the, that the commission basically questioned her credibility in regard to what she was capable of doing, or because of what she was capable of doing after the alleged accident? They found it hard to believe she could complete those duties, her job duties, or go on vacations, or walk through an airport, or any of those things? Is that what you believe is the commission's reasoning for questioning her credibility? Yes, petitioner had testified at trial, petitioner testified, and it was two and a half years later, that driving 10 minutes, or 10 minutes into driving, she has severe pain in her arms, she cannot push down on a shampoo bottle, she has trouble traversing stairs, she cannot do, you know, a whole number of things. But of course, petitioner then claims that she was able to do all these kind of similar sort of tasks, not only on the alleged day of loss, and then two days following, and then of course, for those additional 19 days. Did she testify that during those additional activities after the alleged accident, or during those next 19 days, that all those things that she was required to do, that she was able to do those without pain? She did not testify to that as well, at all, any medical testimony that she would not have been able to do those things with or without pain? Um, no, there was not, Your Honor. Then what did the commission basis reasoning to doubt her word if there was no medical testimony that suggested that she was lying about being able to do any of these things? It was petitioners own testimony in the multiple inconsistencies to which she testified to within the record that they relied upon, Your Honor. Okay, thank you. Thank you. I see the red light is on. Are there any further questions from the bench? No. Mr. Mose, you may reply. Your audio is off. Mr. Mose, you're off. There we go. Yeah, sorry about that. Just to be clear, I am not alleging that the employer has a burden of disproving that the claimant had an injury. Obviously, the claimant has the burden of proof that she sustained an injury. I am merely asserting, based upon existing case law, that evidence within the employer's control that it doesn't, if it doesn't produce it, there is therefore an inference that this evidence would be adverse to the employer. What is it that the employer failed to produce? Well, as the commission noted, there were people around, co-workers around when this accident allegedly happened, and the employer didn't produce any of them, didn't produce any statements from any witnesses. When did the employer find out that there were alleged witnesses to an accident that the employer contends didn't happen? On January 5th, the employer's chief pilot completed an accident report at master's request. Now, the state of Illinois requires an employer to complete a Form 45 pilot if the employee misses more than three days to a work injury. In order to complete a Form 45, the employer has to conduct some investigation in order to answer the questions listed on the Form 45, and the law requires the employer to keep these records regarding, relating to the injury. So, assuming they follow the law, and assuming... Does the form require them to go out and search for witnesses? No, no, but the form requires them to provide information about how the accident happened. Go ahead, I'm sorry. Yeah, and that's provided by the alleged injured worker, correct? Form 45? No, that's a state form that the employer... I know it's a state form, but the information that they have to put in there. Right, I think good practices are that the employer talks to the witnesses, and I've... That's assuming they know there are witnesses. They would presume they... I mean, I can't imagine an employer would pay TTD for two years without ever investigating the claim. Regarding her, quote, unquote, out-of-state vacation after her injury, it's a little tedious listening to that, because she said she was off for Christmas, she went to her family. She didn't say she drove anywhere. No one asked her if she drove, so no one knows what she did. It wasn't asked. To assume that she somehow engaged in some sort of rigorous physical activity when she's just with her family over Christmas is a leap in logic. And it's not something the commission relied upon. You know, the commission didn't rely upon any of the surveillance evidence, and her attempts to explain that she looked at a calendar after she saw the first surveillance video, the arbitrator was grumpy that day and didn't want her to testify regarding what she looked at her calendar and saw. But it has nothing to do with whether she sustained an accident or not, and the commission didn't address it. So did the... Was that video ever looked at, and by whom? Yeah, it was played at trial. So when you say rely on, they didn't mention it in their findings? Right. It was not listed as a reason that her testimony was, quote, unquote, inconsistent. I don't want to go on and on about, you know, but there's about a lack of evidence. But the commission majority imagines the inconsistencies for masters. It's an imagination about, well, we think she should have done this, and she didn't, so she's inconsistent. And that's not an accurate assessment of the evidence. That's imposing their own belief structure on the case and reaching a result from that. So I thank the court for this time. Any questions from the bench? Thank you, Mr. Moos. Thank you both for your arguments in this matter this afternoon.